No. 25-3069

# United States Court of Appeals for the Third Circuit

CATHERINE ANN CYR, Administratrix of the Estate of Vincent Alexander Davalos,

*Plaintiff-Appellant*,

*v.*

COUNTY OF SCHUYLKILL, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Middle District of Pennsylvania, Case No. 22-cv-453

## REPLY BRIEF OF APPELLANT


Barry H. Dyller
Chad J. Sweigart
DYLLER & SOLOMON LLC
88 North Franklin Street
Wilkes-Barre, PA 18701
(570) 829-4860

Paul Brzyski
Daniel N. Lerman
Hannah Kanter
Chloe Rizk
HERBERT SMITH FREEHILLS KRAMER (US) LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
(202) 471-3046
paul.brzyski@hsfkramer.com

*Counsel for Plaintiff-Appellant Catherine Ann Cyr*

## TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. Summary Judgment On Cyr's Claims Against Officer Bettinger And Nurse Gross Was Improper ........ 2

A. Officer Bettinger ........ 2

B. Nurse Gross ........ 7

II. The District Court Erroneously Granted Summary Judgment On Cyr's *Monell* Claim ........ 11

III. Alternatively, The Court Should Adopt *Kingsley*'s Standard ........ 18

CONCLUSION ........ 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beers-Capitol v. Whetzel*,
256 F.3d 120 (3d. Cir. 2001) ........ 22

*Bielevicz v. Dubinon*,
915 F.2d 845 (3d Cir. 1990) ........ 16

*Farmer v. Brennan*,
511 U.S. 825 (1994) ........ 20

*Helphenstine v. Lewis Cnty.*,
60 F.4th 305 (6th Cir. 2023) ........ 8, 9

*Hightower v. City of Philadelphia*,
130 F.4th 352 (3d Cir. 2025) ........ 12

*Iko v. Shreve*,
535 F.3d 225 (4th Cir. 2008) ........ 5, 6

*Johnson v. City of Shelby*,
574 U.S. 10 (2014) ........ 8

*Kingsley v. Hendrickson*,
576 U.S. 389 (2015) ........ 18, 20, 21

*Losch v. Borough of Parkesburg*,
736 F.2d 903 (3d Cir. 1984) ........ 12

*Miranda v. Cnty. of Lake*,
900 F.3d 335 (7th Cir. 2018) ........ 19

*Natale v. Camden Cnty. Corr. Facility*,
318 F.3d 575 (3d Cir. 2003) ........ 1, 13, 15

*Pearson v. Prison Health Serv.*,
850 F.3d 526 (3d Cir. 2017) ........ 7

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Pittman ex rel. Hamilton v. Madison Cnty.*,
108 F.4th 561 (7th Cir. 2024) .................................................. 20, 21, 22

*Rush v. City of Philadelphia*,
78 F.4th 610 (3d Cir. 2023) .................................................................. 10

*Sandoval v. Cnty. of San Diego*,
985 F.3d 657 (9th Cir. 2021) ................................................................ 23

*Short v. Hartman*,
87 F.4th 593 (4th Cir. 2023) ........................................................... 6, 20

*Spruill v. Gillis*,
372 F.3d 218 (3d Cir. 2004) .......................................................... 4, 5, 6

*Thomas v. City of Harrisburg*,
88 F.4th 275 (3d Cir. 2023) ......................................................... 2, 3, 19

*United States v. Stevens*,
70 F.4th 653 (3d Cir. 2023) .................................................................. 19

**Other Authorities**

5 *Wright & Miller's Federal Practice & Procedure* § 1219
(4th ed. 2026 update) ............................................................................. 8

## INTRODUCTION

Defendants are correct that Cyr's opening brief "attempts to bring forth facts not included in the District Court's opinion." Cnty. Br. 21. The district court's failure to even acknowledge (let alone address) much of the record evidence on summary judgment was its most elementary mistake. That mistake, alone, warrants reversal. The court then compounded that error by drawing inference after inference in Defendants' favor, misreading relevant precedents on qualified immunity and *Monell* liability, and, ultimately, applying the outdated subjective standard for deliberate indifference.

Defendants' attempts to defend the district court's decision are unpersuasive. The individual Defendants try to hide behind the medical credentials of Nurse Gross, but their appeals to deference for genuine medical judgment are without citation, and the law does not require deference here. And PrimeCare and the County offer no compelling distinction between this case and *Natale v. Camden County Correctional Facility*, 318 F.3d 575 (3d Cir. 2003)—nor do they seriously try to defend the actual rationale the district court gave to grant summary judgment on Cyr's *Monell* claim. This Court should reverse.

## ARGUMENT

### I. Summary Judgment On Cyr's Claims Against Officer Bettinger And Nurse Gross Was Improper

The district court erred in granting summary judgment in favor of Officer Bettinger and Nurse Gross on Cyr's deliberate indifference claim. As explained in the opening brief, the district court entirely ignored critical record evidence supporting Cyr—including extensive video footage and Defendants' own statements reflecting their knowledge that Davalos faced a substantial medical risk. *See* Opening Br. 24–28, 36–38. The district court then compounded its error by drawing sharp factual inferences in Defendants' favor (*see* Opening Br. 28–30, 43–50); misreading this Court's qualified immunity decision in *Thomas v. City of Harrisburg*, 88 F.4th 275 (3d Cir. 2023), (Opening Br. 31–36); and misclassifying Cyr's claim as one of mere disagreement with the level of medical care rendered (Opening Br. 38–42). Any one of these errors warrants reversal, and Defendants' arguments defending the district court's decision are unpersuasive.

#### A. Officer Bettinger

County Defendants concede that a live factual dispute exists as to whether Officer Bettinger "believed Davalos had consumed a significant

amount of drugs." Cnty. Br. 23–24 ("[t]his may be true that such dispute belongs to the jury"). That alone warrants reversal. Whether Bettinger believed that Davalos had ingested a sufficiently large quantity of drugs such that it posed a substantial health risk is the essential factual dispute on which his deliberate indifference turns. County Defendants write off the dispute as "irrelevant" and assert that the "material fact at issue" is "whether Ofc. Bettinger was subjectively indifferent to Davalos' medical needs." *Id.* But those issues are one and the same. If Bettinger believed Davalos had consumed a dangerously large quantity of drugs, and did nothing about it, then he was deliberately indifferent. *See Thomas*, 88 F.4th at 285 (the deliberate indifference standard is satisfied where "an officer is aware of the oral ingestion of narcotics . . . under circumstances suggesting the amount consumed was sufficiently large that it posed a substantial risk to health"). County Defendants thus concede the issue.

But County Defendants nevertheless argue that Cyr "fails to establish evidentiary support as to how Ofc. Bettinger could have *known*" of the substantial health risk that Davalos faced. Cnty. Br. 20. Not so. Cyr devoted three pages of her opening brief (at 24–26) to describing the

evidence, which includes, *inter alia*, Davalos's appearance captured on video during his time with Bettinger, Bettinger's own statements describing how he viewed Davalos (he "seemed like he was in distress"), and Bettinger's own demonstration of Davalos's breathing. Thus, the evidence does not just show that Bettinger "*could have* known" (Cnty. Br. 20 (emphasis added)), though it certainly shows that; it shows that Bettinger *did* in fact know of Davalos's health risk.

Relying on *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004), County Defendants repeatedly assert that summary judgment was warranted because Officer Bettinger relied on the judgments of the PrimeCare medical staff at SCP and therefore cannot be considered to have acted with deliberate indifference. *See* Cnty. Br. 14, 19, 23. Yet County Defendants cite no record evidence to support such assertions of Bettinger's reliance. Their claims about what "the record reflects" (at 14) and "[t]he evidence reflects" (at 23) about Officer Bettinger's reliance ring hollow.

But even if they had pointed to record evidence to support their claim, the latitude that *Spruill* gives to non-medical prison staff in certain circumstances would have no bearing here. *Spruill* held that

"non-medical prison official[s] will generally be justified" in relying on prison medical staff, but it conditions that limitation on circumstances in which the inmate "is under the care of medical experts" at the time of purported reliance. 372 F.3d at 236. Indeed, in assessing the allegations against the non-medical prison defendant before it, *Spruill* drew a sharp distinction between the periods before and after the inmate "was under medical care." *See id.* at 236–37.

In this case, at the time of his interactions with Officer Bettinger, Davalos had merely been admitted to the prison following a brief interaction with Nurse Hysock at the entrance. He had yet to have his medical screening and had yet to see Nurse Gross. As explained in the opening brief, if the short check-in encounter with Nurse Hysock (which merely cleared him for prison admission) constitutes being "under the care of medical experts," then every inmate at SCP was under such care, and all medical staff would effectively have immunity against any deliberate indifference claim. That cannot be correct.

The Fourth Circuit's decision in *Iko v. Shreve*, 535 F.3d 225 (4th Cir. 2008), clarifies this point further. The *Iko* defendants relied on *Spruill* when, after failing to secure medical care, they argued they were

entitled to defer to the medical decisions of a nurse and were otherwise "relieved of any further duty to monitor [the inmate's] health." *Id.* at 242. The court rejected that argument, explaining that non-medical prison officials must be held liable for *their own* decisions taken while an inmate is "in their charge." *Id.* "In the absence of an allegation that [the officer] knew of and relied on a medical provider's evaluation *in the moment*, she cannot use the medical provider's inaction to justify her own post-hoc." *Short v. Hartman*, 87 F.4th 593, 615 (4th Cir. 2023). Yet that is precisely what Defendants attempt here.

And in any event, *Spruill*'s recognition of justified reliance by non-medical prison personnel does not change the relevant deliberate indifference inquiry. The analysis in *Spruill* is nothing more than a discussion of "the Eighth Amendment scienter requirement of deliberate indifference." 372 F.3d at 236. *Spruill* merely notes the obvious: that a "non-medical prison official will generally be justified in believing that the prisoner is in capable hands," and that such a reasonable belief can bear on the scienter requirement. *Id.* But here, irrespective of any treatment from the medical staff at SCP (and there was none), Bettinger's own words—that he perceived Davalos as being "in distress,"

JA781 (17:10–17:20)—demonstrate that he possessed the requisite scienter. He cannot negate his personal knowledge—and his deliberate indifference—by passing the buck to the medical staff (who hadn't evaluated him in any event).

### B. Nurse Gross

Following the district court's lead, PrimeCare Defendants try to shoehorn Cyr's claim against Nurse Gross into the box of inadequately rendered medical care, rather than denial of medical care. PrimeCare Br. 17–21. But the claim does not fit Defendants' preferred box.

This Court's *Pearson v. Prison Health Service*, 850 F.3d 526 (3d Cir. 2017), decision counsels that the category of claim—a "denial" claim or an "inadequate medical treatment" claim—should be evaluated based on what "the complaint alleges." *Id.* at 535. And from the jump, Cyr alleged in her complaint that "Nurse Gross . . . did not place Mr. Davalos in a cell for observation nor did [she] send him to the hospital for monitoring and treatment" and "[i]nstead, Nurse Gross . . . left Mr. Davalos alone in his cell." JA270 (¶¶83–84). And in summarizing the factual allegations for the claim, Cyr alleged that "all Individual Defendants observed Mr. Davalos, did nothing and sent him to an unmonitored cell to die" and that

the "Individual Defendants' deliberate indifference is further reflected by their failure to monitor Mr. Davalos or provide care." JA273 (¶¶104, 107). Those are allegations of denial of care.

Under the federal pleading rules, "it is unnecessary to set out a legal theory for the plaintiff's claim for relief." 5 *Wright & Miller's Federal Practice & Procedure* § 1219 (4th ed. 2026 update). *See also Johnson v. City of Shelby*, 574 U.S. 10 (2014) (per curiam) (summarily reversing summary judgment, which had been granted because plaintiffs failed to expressly invoke 42 U.S.C. § 1983 in their complaint). Here, based on the *facts* alleged in the complaint (which are now supported by evidence), irrespective of labels used, Cyr has adequately pleaded this case as a "denial" claim.[1]

PrimeCare Defendants' position on the applicability of *Helphenstine v. Lewis County*, 60 F.4th 305 (6th Cir. 2023), is similarly unavailing. In *Helphenstine*, the Sixth Circuit held that a jury was empowered to determine whether a physician's medical care was "so

[1] Resorting to semantic distinctions, PrimeCare Defendants emphasize Cyr's several uses of the word "adequate" in her opening brief. PrimeCare Br. 17. But those passages all also reference the "denial" of care, *see* Opening Br. 4, 14, 15, 21—and in any event, the substance of Cyr's argument (at 38–42) makes her position clear.

cursory as to amount to no treatment at all." *Id.* at 322. The court explained that where a defendant is "subjectively aware of the seriousness of the inmate's medical condition, [the] decision to treat [the inmate]" minimally still "amount[s] to a conscious disregard of his needs." *Id.* at 322–23. That makes sense: a decision by a medical professional to barely treat the inmate in the face of a substantial health risk is no less deliberately indifferent than doing nothing at all.

That is why PrimeCare Defendants' attempts to distinguish *Helphenstine* on factual grounds—like whether the provider was "physically present" (Br. 20)—miss the mark. The pertinent question is whether Nurse Gross consciously disregarded Davalos's serious medical need. *Helphenstine* stands for the proposition that the jury has authority to conclude that the treatment rendered was "so cursory as to amount to no treatment at all," look past any claims of deference, and find that the defendant consciously disregarded a serious medical concern by doing next to nothing to help the inmate. Here, where all that Nurse Gross did was wake up Davalos with smelling salts after finding him unresponsive and seizing, the jury is well-positioned to draw such a conclusion.

Finally, PrimeCare Defendants argue repeatedly that Cyr has no evidence disputing Nurse Gross's account. PrimeCare Br. 21–22, 25. Such a conclusion is only possible if every other part of the record is ignored. The record contains extended video footage showing Davalos in a deteriorating condition in the period leading up to his visit with Nurse Gross. *See* Opening Br. 6–9. Davalos was unable to walk without supporting himself on the wall, was frequently hunched over himself when seated, and was seemingly reliant on non-verbal communication. *Id.* Officer Bettinger explained that he perceived Davalos to be "in distress." JA781 (17:10–17:20). At one point, Davalos was unresponsive and seizing, JA1001 (Chart Notes); JA942 (Gross Dep. 24:11–18)—an "emergency" that required the nurse to be called, JA956 (Gross Dep. 38:21–22). Several hours later, he was dead. All of that is evidence in the record, and all of it undermines Nurse Gross's account—and thus, at a minimum, creates a factual issue precluding summary judgment. *See Rush v. City of Philadelphia*, 78 F.4th 610, 617 n.9 (3d Cir. 2023) (explaining that where the key witness is unable to testify, courts should "look[ ] to circumstantial evidence that, if believed, would tend to

discredit the [defendant's] story, and consider whether this evidence could convince a rational fact finder") (internal quotation marks omitted).

## II. The District Court Erroneously Granted Summary Judgment On Cyr's *Monell* Claim

Schuylkill County Prison had a known custom of delaying medical screenings of new inmates to the third nursing shift, and it did so because the prison was understaffed and so earlier shifts were "so busy." JA1018–19 (Wapinsky Dep. 13:23–14:12). Davalos "should have been" on detox watch, JA624–25 (Hysock Dep. 58:22–59:2), but he wasn't, because he never had his medical screening. Instead, he died in his cell after being unmonitored by regular patrols for an hour and a half. Summary judgment on Cyr's *Monell* claim for that custom at SCP was improper, and Defendants' arguments defending the district court decision fail.

For their part, County Defendants argue that Cyr cannot survive summary judgment because she has not shown "a pattern of prior incidents or knowledge of similar violations of constitutional rights." Cnty. Br. 25–26. In their view, apparently, Davalos needed to be one in a long line of deaths at SCP resulting from the delayed medical screenings. That is wrong.

To the extent a pattern is required, it is required because a custom or policy "cannot ordinarily be inferred from a single instance." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 911 (3d Cir. 1984). And because the pattern "put[s] the city on notice that, by failing to act, it was being deliberately indifferent." *Hightower v. City of Philadelphia*, 130 F.4th 352, 357 (3d Cir. 2025). The law does not require a pattern for pattern's sake—the pattern helps demonstrate the *existence of the custom* and that the entity-defendant *was on notice* of it.

Here, Cyr has established the existence of SCP's custom of delaying medical screenings through the testimony of six different witnesses. Opening Br. 51. And she established notice through the testimony of the entities' Rule 30(b)(6) witnesses, both of whom stated that they knew that SCP delayed medical screenings. Opening Br. 52. Indeed, Warden Wapinsky even explained why the custom existed: "Because" the earlier shifts were "so busy." JA1018–19 (13:23–14:12). In other words, rather than trying to demonstrate existence of a custom of delayed medical screenings at SCP by identifying other incidents of delayed screenings,

Cyr has far more compelling evidence: direct evidence from six witnesses testifying to its existence.[2]

This Court's decision in *Natale v. Camden County Correctional Facility*, 318 F.3d 575 (3d Cir. 2003), illustrates the point. In *Natale*, the Court *did not once inquire* whether other inmates had been harmed by the prison's policies—the existence of the "obviously inadequate practice" at the prison was established *directly* by a nurse's testimony. *Id.* at 584. The relevant question was not whether other inmates had been harmed by the prison's policies (policies that created a set of circumstances that could cause medication delays), but whether the prison "turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights." *Id.* The evidence demonstrates just that here—SCP had a custom of "routinely" delaying medical screening to third shift because earlier shifts were "so busy," and the County and PrimeCare were aware of the custom. Opening Br. 51–52. And it was

[2] And to the extent Cyr would need to demonstrate a "pattern" at SCP, the witnesses testified to it—they all said that the delayed screenings were routine.

that custom that caused the deprivation of rights at issue—namely, deliberate indifference to Davalos's medical needs.

Next, without identifying any supporting legal authority, County Defendants assert that Cyr's claims should fail at summary judgment because she "has failed to provide any expert testimony" on causation. Cnty. Br. 28. That assertion is wrong and it only accentuates the district court's erroneous grant of summary judgment on causation grounds without reference or citation to any record evidence.

In fact, Cyr *does* have expert testimony on this issue. Cyr's expert testified that PrimeCare's written protocols—which call for the health screenings to be completed within four hours of admission—"if followed, would have made a difference in the outcome for Mr. Davalos." JA659, JA661. According to Cyr's expert, "[c]learly, the protocols read: people with symptoms of overdose are to be sent to a hospital. Criteria for Detox watch includes placement in a cell that permits close observation and checks by correctional officers at least every 15 minutes." JA659. The expert also concluded that "[t]he Schuylkill practice of waiting until third shift for full medical/nursing health evaluation appears to be the reason

for lack of implementation of the [Doctor's Order to Jailer (DOJ)]." JA656.

Cyr disputes that expert testimony is, as a legal matter, required at all in this context—a lay jury is capable of assessing whether SCP's custom of delaying medical screenings to third shift was a proximate cause of Davalos's death. Indeed, no expert testimony was required to survive summary judgment on the *Monell* claim in *Natale*—and in fact, this Court even found that, on the state law medical malpractice claim, an affidavit of merit was not required because "defendant's careless acts are quite obvious." 318 F.3d at 580. The same is true here.

The district court ignored the record evidence in favor of its own reductive conclusion (which Defendants did not even press below) that, simply because Davalos saw Nurse Hysock upon entering the prison and Nurse Gross when she was called, Davalos "had access to medical personnel," JA21, and, *ergo*, the custom at SCP played no role. As explained in the opening brief (at 55–57), that conclusion is flawed—and not for the Court to make in any event. As this Court has explained, "[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional

infringement should be left to the jury." *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).

For their part, PrimeCare Defendants are wrong to assert that summary judgment was proper because, "regardless of whether Davalos was on a detox watch, CO Sabol notably observed Davalos three minutes before finding him unresponsive." PrimeCare Br. 31. PrimeCare Defendants appear to suggest that Officer Sabol saw Davalos in an acceptable condition at 7:39 pm, only to find him dead at 7:42, implying that those three minutes were the critical minutes in which Davalos precipitously deteriorated and died, such that no detox watch of any interval would have saved him. The evidence doesn't support that view.

While it's true that the video shows Officer Sabol walking by Davalos's cell and then walking by again three minutes later (ultimately going in and finding Davalos dead), JA847 (E Block 1 Video, 4:28:00–4:28:41, 4:31:33–4:32:39), Officer Sabol's testimony rebuts Defendants' factual interpretation. Sabol did *not* testify that he saw Davalos in an acceptable condition on his first pass, only to find him on the floor dead on the second pass. Sabol instead testified that on that round, he saw Davalos "lying by the door" which in his view was "a common practice by

inmates because of how hot it was." JA891 (Sabol Dep. 43:15–20). But Sabol "opened up the door to see how [Davalos] was feeling because [Sabol] had to call medical earlier, and that's when [Sabol] discovered [Davalos] unresponsive and not breathing." JA891 (43:17–20). Sabol explained that he "opened up the door just to check on him, and that's" when he "discovered him unresponsive and not breathing." JA891 (43:17–25). In other words, on his 7:40 pm round, Sabol did not enter Davalos's cell because Davalos was in a visibly worse condition than he had been just three minutes prior (as Defendants suggest)—Sabol went into the cell "just to check on him," and *only then* discovered the problem. Sabol's testimony thus supports Cyr's causation argument because, had Davalos been on a formal detox watch with a monitoring officer under stricter orders to do more frequent and intensive checks, the discovery of a potential problem would not have been subject to the whims of when Sabol decided "just to check on him."

Relatedly, PrimeCare Defendants also misquote Cyr's expert when they claim that she "opined that the DOJ would not have been helpful to Davalos." PrimeCare Br. 33 (citing JA656). PrimeCare's argument is that Cyr's expert is denying that a detox watch would have helped

Davalos. But that's not what the expert said. In the relevant passages, the expert is not saying that a detox watch order via a DOJ (*i.e.*, what Cyr argues was needed) would have been unhelpful to Davalos; the expert is testifying that the "order" that Davalos *did* receive—an "order . . . for opiate detox and taper"—was insufficient because "Davalos needed much more than a taper." JA656.

## III. Alternatively, The Court Should Adopt *Kingsley*'s Standard

For the reasons stated, and based on the evidence in the record, the district court should have denied summary judgment even applying the higher subjective deliberate indifferent standard. If the Court disagrees, however, then it should join the circuits that have adopted the objective standard of *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Cyr and Amici detail at length the rationale for why an objective standard is the correct one. *See* Opening Br. 60–66; Amici Br. 5–20. Defendants offer no persuasive reason why the subjective standard applied by the district court here should be maintained.

*First*, there is no serious argument that the issue has been resolved in this Circuit. This Court has not squarely held in a precedential post-*Kinglsey* decision that a subjective standard, rather than an objective

one, applies to medical claims by pretrial detainees. PrimeCare Defendants cite (at 38) only unpublished decisions and *Thomas v. City of Harrisburg*, 88 F.4th 275 (3d Cir. 2023), to claim that the Court has maintained the subjective standard post-*Kingsley*. But in denying qualified immunity to the officers under the subjective standard, *Thomas* only noted that the Constitution "affords pretrial detainees protections *at least as great* as those available to inmates under the Eighth Amendment." *Id.* at 281 n.23 (emphasis added). And contrary to PrimeCare Defendants' suggestion (at 38–39) that a panel of this Court may only revisit prior cases where intervening Supreme Court authority is "directly controlling," this Court has held that it may revisit prior cases where new Supreme Court precedent "undermine[s] the . . . rationale" of this Court's prior cases. *United States v. Stevens*, 70 F.4th 653, 659 (3d Cir. 2023). As other circuits have held, *Kinglsey* undermines the rationale of the subjective deliberate indifference standard in this context. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) ("We see nothing in the logic the Supreme Court used in *Kingsley* that would support . . . dissection of the different types of claims that arise under the Fourteenth Amendment's Due Process Clause.").

*Second*, PrimeCare Defendants' attempt to create an action/inaction dichotomy is unavailing. *See* PrimeCare Br. 39–40. *Kingsley*'s objective standard still requires that the defendant "intended to carry out a certain course of actions"—in medical care cases, a "*decision* to deny medical care" in light of an objectively serious risk of harm. *Pittman ex rel. Hamilton v. Madison Cnty.*, 108 F.4th 561, 569–70 (7th Cir. 2024) (emphasis added). The action/inaction distinction is artificial, as this case illustrates. Officer Bettinger and Nurse Gross can readily be characterized as each *abandoning* Davalos in his cell—making affirmative decisions to terminate their interactions with him and leave him unattended.

And as the Fourth Circuit recognized, *Kingsley* itself, and *Farmer v. Brennan*, 511 U.S. 825 (1994), rejected the action/inaction dichotomy Defendants seek to create. *Short*, 87 F.4th at 611 ("The Supreme Court has recognized that an objective test requires civil recklessness, observing that 'civil law generally calls a person *reckless* who acts or (if the person has a duty to act) *fails to act* in the face of an unjustifiably high risk of harm that is either known or *so obvious that it should be known*.'" (quoting *Farmer*, 511 U.S. at 836–37)).

*Third*, PrimeCare Defendants point to language in *Kingsley* discussing the need to "account for the 'legitimate interests'" of jail management, but never explain how that language—which *Kingsley* was using to describe the application of the objective standard in the case before it—would be inapplicable here if an objective standard also applied. PrimeCare Br. 41. Indeed, the objective standard is preferable to a subjective one on that score. The objective standard assesses whether "a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured," *Pittman*, 108 F.4th at 570—an inquiry accounting for everything a reasonable officer understood at the time, including the "policies and practices . . . needed to preserve internal order." *Kingsley*, 576 U.S. at 397.

*Fourth*, PrimeCare Defendants expose the weakness of their position by asserting (at 43) that it would be "untenable" to have different litigation outcomes "with the only variable being an inmate's trial status as the determinative factor." Why? Defendants cannot contest that conditions of confinement for pretrial detainees are governed by the Fourteenth Amendment, that pretrial detainees cannot be "punished," or that the subjective standard derives from a construction of the Eighth

Amendment. The "trial status" of an inmate is a factor of huge legal consequence. That un-convicted and convicted persons would be treated the same in the face of the different rights afforded to each population is the anomaly.

*Finally*, Defendants' assertion that "Plaintiff has not indicated how her claims would be saved if the *Kingsley* standard was applied" has no merit. PrimeCare Br. 43. Cyr's opening brief described at length the facts and evidence for her claims against Officer Bettinger and Nurse Gross. *See* Opening Br. 24–28, 36–38. From this evidence, Cyr's submission is that both Bettinger and Gross actually knew of the excessive risk to Davalos because "the excessive risk was so obvious that [they] must have known." Opening Br. 23 (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d. Cir. 2001)). All of those same facts and pieces of evidence, which support the conclusion that they knew of the risk (subjective standard), likewise support the conclusion that a "reasonable officer in [their] shoes would have recognized" the risk (objective standard). *Pittman*, 108 F.4th at 570.

Without belaboring the point or rehashing the evidence again, with respect to Nurse Gross, she found Davalos unresponsive and seizing, and

knew that he was in the throes of intoxication, and yet merely woke him up with smelling salts. "There can be no debate that a reasonable nurse would understand that an individual who is unresponsive and seizing faces a substantial risk of suffering serious harm." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 670 (9th Cir. 2021). And with respect to Officer Bettinger, there is extended video footage of Bettinger observing Davalos in a deteriorated state, and by his own admission, he recognized Davalos was "in distress." If he recognized it, so too would a reasonable officer.

## CONCLUSION

For the reasons stated above, this Court should reverse or vacate the judgment of the district court.

Respectfully submitted,


*<u>/s/ Paul Brzyski</u>*
Paul Brzyski
Daniel N. Lerman
Hannah Kanter
Chloe Rizk
HERBERT SMITH FREEHILLS KRAMER (US) LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
(202) 471-3046
paul.brzyski@hsfkramer.com

Barry H. Dyller
Chad J. Sweigart
DYLLER & SOLOMON LLC
88 North Franklin Street
Wilkes-Barre, PA 18701
(570) 829-4860


April 8, 2026

*Counsel for Plaintiff-Appellant Catherine Ann Cyr*

## CERTIFICATE OF COMPLIANCE WITH IDENTICAL PAPER COPY AND VIRUS SCAN REQUIREMENTS

Pursuant to Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the paper copies filed with the Court, and that the electronic brief was scanned for viruses using Trellix Endpoint Security, Version 10.7, and no virus was detected.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE AND TYPE-STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because the brief contains 4,539 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Paul Brzyski*
Paul Brzyski

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Paul Brzyski*
Paul Brzyski